[Crim. No. 7661.   In Bank.   April 22, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. DONALD WINSTON REEVES et al., Defendants and Appellants.

William J. Gintjee, under appointment by the Supreme Court, for Defendants and Appellants.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., John F. Kraetzer, Edward P. O'Brien and Keith E. Pugh, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

PETERS, J.—Defendants appeal from judgments, based on jury verdicts, finding them guilty of possession of marijuana in violation of section 11530 of the Health and Safety Code. The sole question presented is whether the arresting officers had reasonable and probable cause to enter Reeves' hotel room, and there search that room, and arrest Reeves and also Tuttle, the other occupant of that room. We have concluded that they did not have such reasonable and probable cause, and consequently the search and arrests were illegal.

The facts stated most favorably to respondent are: On the morning of September 13, 1961, Officer Martin, an experienced inspector attached to the narcotic detail of the San Francisco Police Department, received a telephone call from an anonymous female informer. She told the officer that two "narcotic losers" by the names of Donald Reeves, staying at the King George Hotel, and Ken McDonald, who operated an automobile agency on Van Ness Avenue, were in possession of marijuana. The phrase "narcotic losers" was understood by Martin to mean that the persons named had been convicted of a narcotic offense. Martin had never heard the voice before, and the caller did not identify herself.

Prior to the telephone call, Inspector Martin knew Reeves. He had talked with Reeves as the result of a prior narcotic investigation that had not resulted in criminal charges being filed against Reeves. During the course of that conversation, he also discovered that Reeves, several years before, had been convicted of a narcotic offense in Texas. He also learned, in that conversation, that Reeves had been employed locally by a railroad company and had a claim pending against that railroad for a claimed injury. Inspector Martin, until he received the telephone call, knew nothing about Ken McDonald. Immediately after the call, however, he caused the records to be searched, and discovered that a Ken McDonald was listed as having an earlier conviction in the federal court for a narcotic violation. He also discovered that a Ken McDonald operated an automobile agency on Van Ness Avenue in San Francisco.

Armed with this information, Inspector Martin, together with Inspectors Fogarty and Lawler, proceeded to the automobile agency, where he interviewed McDonald. Martin testified that during that interview "a marijuana cigarette was found" on the person of McDonald. The circumstances under which that cigarette was "found" are of considerable importance, but unfortunately are only partially disclosed in the evidence. Admittedly McDonald was arrested, but he was never prosecuted for the possession of the cigarette. When queried about why McDonald was not prosecuted, Martin replied, "There was a search and seizure problem." When Martin was asked later in the proceeding if he had illegally searched McDonald, an objection was sustained on the ground that the question called for the opinion and conclusion of the witness on a matter of law. Later, when one of the defense counsel asserted that the officer had admitted that the search of McDonald was illegal, the prosecutor re-

plied "there is nothing in the record to show whether the search of McDonald was either legal or illegal." Although thus challenged, the prosecution made no attempt to show that that search was legal.

After the police had placed McDonald under arrest, he was asked where he had secured the marijuana cigarette they had just "found" in his possession. He replied that the evening before he had secured three marijuana cigarettes from Donald Reeves at the King George Hotel. McDonald also admitted to the officers that he had had a prior narcotic conviction in the federal court.

Then, without attempting to secure arrest or search warrants, the three officers proceeded to the King George Hotel. There they learned from the manager that Reeves was registered, had been assigned room 302, and was presently in his room. Officer Martin, then having his previous talk with Reeves in mind about the railroad claim, asked the manager to telephone Reeves, and to tell him falsely that there was a registered letter from the railroad company at the desk, and that he should come down and get it. The manager made the call at the officer's request, and Reeves answered that as soon as he got dressed he would come down and get the letter.

The three officers proceeded to room 302 where one placed himself on one side of the door, another on the other side, and Martin stood directly in front of it. When Reeves opened the door, Martin testified that because he was a few inches taller than Reeves he could see into the room over Reeves' head or shoulders. He stated that he observed a small bedside table, about 11 feet from him, that was illuminated with a table light. He said that he saw two packages of cigarette papers and what appeared to him to be a partially consumed marijuana cigarette, called by the witness a "roach," on the table. He admitted that the cigarette papers were not distinctive, and were of a type commonly used by persons rolling their own cigarettes, but stated that they were also of a type sometimes used to roll marijuana cigarettes. Martin testified that, when he saw the "roach," he and the other officers entered the room without the permission of Reeves, and that he walked over to the bedside table and saw that the small cigarette butt looked like the remains of a marijuana cigarette. He thereupon arrested Reeves, and ordered him to sit in a chair near the bed. He then asked Reeves if there was any more marijuana in the room, and Reeves pointed to a desk drawer. Martin opened that drawer

and discovered several more "roaches," some bulk marijuana in a brown sack, and some fine marijuana in a folded cardboard. The other two inspectors searched other places in the room. Inspector Fogarty, in a closet, discovered a bag containing what appeared to be more bulk marijuana. Reeves admitted ownership of all the marijuana in the room.

When the officers entered the room they observed that a person, later identified as Tuttle, was apparently asleep in the bed. Tuttle was awakened by Inspector Lawler, and attired only in his underwear sat on the edge of the bed. His shirt and slacks were folded on the back of the nearby chair in which Reeves was sitting. Martin testified that he asked Tuttle if these clothes were his, and upon being told that they were, started to hand them to Tuttle. As he did so he saw a brown paper bag similar to the one discovered in the desk drawer, fall out of the pocket of Tuttle's slacks. He opened the bag and observed what appeared to be marijuana. He asked Tuttle if the bag belonged to him, and getting no response, arrested him. At the trial Tuttle testified that the bag and its contents were not his, and that he knew nothing about them. Both he and Reeves testified that the bag had not come out of Tuttle's pocket, and Reeves testified that Martin simply picked it up from the floor near the chair. There was expert evidence that the "roaches" were in fact marijuana, and that the material in the bags and containers was, in fact, marijuana.

Reeves and Tuttle both testified that they were acquaintances, that in the early morning hours of September 13, 1961, Tuttle was drunk, and that Reeves met him after 2 a.m. in a restaurant. Reeves testified that Tuttle did not know where he had parked his automobile, that he brought Tuttle to his hotel room so he could sleep off his drunken condition, and that he undressed him and put him to bed. Both Tuttle and Reeves testified that this was the first time Tuttle had ever been to the room of Reeves.

At the trial defendants objected in proper form to the introduction of the marijuana into evidence on the ground that it had been secured by an unlawful search and seizure and that the arrests were illegal. The objections were overruled.

██ Inasmuch as the search and seizure and arrests were accomplished without search or arrest warrants the question is whether the officers had reasonable and probable cause to enter the room. The prosecution theory was that the officers had such reasonable and probable cause because Martin saw

what appeared to be a marijuana "roach" when the door was opened. The theory of the defense was that nothing seen when the door was opened could constitute reasonable and probable cause, because the door was opened as a result of the ruse and subterfuge employed by the police, it being contended that evidence so obtained is illegally secured. The trial court, in passing on the lawfulness of the search and arrests, considered only that point. After expressing serious doubts on the question, the trial court ruled that the evidence secured as a result of the false message and ruse of the police had not been illegally secured.

This ruling was clearly erroneous. Unless the officers had reasonable cause to enter Reeves' room before the door was opened they cannot lawfully rely on any information secured by inducing the opening of that door by ruse or subterfuge. It is well settled by both federal and state decisions that "an entry obtained by trickery, stealth or subterfuge renders a search and seizure invalid" (*People* v. *Roberts,* 47 Cal.2d 374, 378 [303 P.2d 721]; to the same effect see *People* v. *Albert,* 182 Cal.App.2d 729, 737 [6 Cal.Rptr. 473]; *Gouled* v. *United States,* 255 U.S. 298, 305 [41 S.Ct. 261, 65 L.Ed. 647, 651]; *Fraternal Order of Eagles, No. 778* v. *United States,* 57 F.2d 93).

But, although the officers had no legal right to rely on facts gained by ruse or subterfuge in determining whether they had reasonable and probable cause to enter, search and arrest, it still remains to be determined, when the officers arrived at the King George Hotel and found that Reeves was there registered, did they, at that moment, know sufficient facts so as to have had reasonable and probable cause to enter the room without a warrant?

What did the officers know or reasonably suspect when they arrived at the hotel? Martin had received the telephone call from the anonymous informer. Information so gained is not alone sufficient to constitute reasonable or probable cause. As was said in *Willson* v. *Superior Court,* 46 Cal.2d 291, 294 [294 P.2d 36]: "Although information provided by an anonymous informer is relevant on the issue of reasonable cause, in the absence of some pressing emergency [citing a case], an arrest may not be based solely on such information [citing several cases], and evidence must be presented to the court that would justify the conclusion that reliance on the information was reasonable." (See also *People* v. *Amos,* 181 Cal.App.2d 506, 509 [5 Cal.Rptr. 451], applying the same

rule to information gained from an arrestee.) Thus, the information gained from an informer or arrestee is insufficient unless corroborated, in essential respects, by other facts, sources or circumstances.

Martin also knew or soon found out that Reeves and McDonald had narcotic records. Of course, such knowledge alone would not constitute reasonable grounds for a search. While it amounted to corroboration of that same information given by the anonymous informer, it was not corroboration of the essential fact, as to whether the two named men were now violating the law. All that the statement that the men were "narcotic losers" indicated was that the informer must have known the men and knew of their past. The same can be said of later discovering that the informer knew the correct addresses of the two defendants.

Then the officers proceeded to the Van Ness Avenue place of business of McDonald. Here the officers "found" him in possession of a marijuana cigarette. If this cigarette were "found" legally this might constitute corroboration of the information given by the anonymous informer—it would corroborate the informer's statement that McDonald was presently possessed of marijuana, and this might very well constitute a basis for believing that if McDonald was possessed of marijuana, Reeves might also be. But if that cigarette were "found" as the result of an unlawful search of McDonald it would not constitute corroboration. The officers had no legal right to rely upon what they learned from McDonald or upon his possession of the cigarette to corroborate the information they received from the anonymous informer, if that discovery was the result of an unlawful search (*People* v. *Haven*, 59 Cal.2d 713, 718 [31 Cal.Rptr. 47, 381 P.2d 927]; *People* v. *Mickelson*, 59 Cal.2d 448, 449-450 [30 Cal.Rptr. 18, 380 P.2d 658]). Thus the issue as to the legality of the arrest and search of McDonald is here crucial.

As already pointed out, the defense clearly raised the question as to the validity of that search. Inasmuch as the officers did not have a warrant to search or to arrest McDonald, the burden was on the prosecution to show proper justification. (*People* v. *Shelton*, 60 Cal.2d 740, 743-744 [36 Cal.Rptr. 433, 388 P.2d 665], and cases cited.) This burden the prosecution failed to sustain. The issue having been raised, in the present state of the record, we must assume that the information gained from McDonald was illegally secured. The prosecution's failure to prove that the search of McDonald was legal is fatal to this case. It cannot rely on the fruits of what,

under the circumstances, must be presumed to have been an unlawful arrest and search of McDonald to corroborate the anonymous informer. Thus the prosecution failed to prove that when the police arrived at the hotel they had probable cause to arrest Reeves. This being so, the judgments must be reversed.

■ The rule that requires a reversal where the incriminatory evidence has been secured by means of an illegal search is not a mere technical rule of evidence. It is based on the fundamental concept that such a rule is required in order to give substance to the rights conferred by the provisions of our federal and state Constitutions prohibiting such seizures. (U.S. Const., 4th Amend., see *Mapp* v. *Ohio,* 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933]; Cal.Const., art. I, § 19, see *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].)

It is, of course, highly commendable that law enforcement officials should desire that all persons violating the law should be arrested and punished. But it is of even greater importance, that in seeking to attain that highly desirable end, law enforcement officials should not trample upon or disregard fundamental constitutional rights. The end does not justify the means. When the desire to punish the lawbreaker runs afoul of constitutional rights, it is the former that must give way. The courts should be alert to see that this is so. It is a fundamental concept of our system of criminal justice that it is better for society that a few criminals escape, than it is for government to use illegal means to accomplish their convictions. For that reason the court cannot and should not struggle to escape the obvious mandate of the constitutional provisions. That is the problem here involved. Constitutional considerations determine that the search and arrests were illegal. Therefore, convictions based upon the illegal search and arrests cannot stand.

The judgments appealed from are reversed.

Traynor, J., Tobriner, J., and Peek, J., concurred.

Gibson, C. J., concurred in the judgment.

McCOMB, J.—I dissent.

Defendants were convicted after trial by jury of violating section 11530 of the Health and Safety Code (possession of marijuana).

*Facts*: About 9 a. m. on September 13, 1961, Inspector Robert Martin received an anonymous telephone call at the Hall of Justice in San Francisco. A female voice, which was unknown to him, said that two "narcotic losers" were in possession of marijuana and named them as Donald Reeves, who lived at the King George Hotel, and Ken McDonald, who operated an automobile agency on Van Ness Avenue. Inspector Martin understood the term "narcotic loser" to mean one who had gone to prison for a narcotic violation.

Prior to the call, Inspector Martin knew from an earlier narcotics investigation that defendant Reeves had been convicted of smuggling narcotics in Texas. The name Ken McDonald was unknown to him; therefore, he conducted a record search and ascertained that McDonald had been in federal prison for a narcotic violation.

Inspector Martin, with Inspectors Fogarty and Lawler, went to the McDonald automobile agency, where they found a marijuana cigarette in McDonald's possession. When asked where he had acquired the cigarette, he replied he had received three marijuana cigarettes from Donald Reeves at the King George Hotel the previous evening. He also stated that he had been convicted of a narcotic violation in federal court.

The three inspectors proceeded to the King George Hotel. They learned from the hotel manager that Reeves was registered in room 302 and that he was presently in his room. At the request of the officers, the manager telephoned Reeves and told him that a letter from the Railroad Commission was downstairs. Defendant Reeves replied that he would be down to pick up the letter as soon as he dressed.

The three officers went to the third floor, outside Reeves' room. One officer was 10 feet to the right of the door, and the other was 6 feet to the left. Inspector Martin stood about 2 feet from, and directly in front of, the door.

Defendant Reeves opened the door and stepped across the threshold. As he and Inspector Martin exchanged a few words, the inspector looked into Reeves' room. About 11 feet from where he stood in the hallway, he saw two packages of cigarette papers, one red, the other white, and what appeared to be a partially consumed marijuana cigarette, or "roach," lying on a small bedside table illuminated by a table lamp.

Having in mind the information from the anonymous informant, his own record check, previous contacts with Reeves, and the information received from McDonald, he entered the

room and examined the "roach." He then arrested defendant Reeves.

Inspector Martin questioned Reeves, who directed him to the desk, where there were additional "roaches" in a box and bulk marijuana in a brown paper sack and in a folded piece of cardboard. Inspector Fogarty discovered in the closet a blue canvas travel bag containing marijuana.

Defendant Tuttle was asleep in bed in Reeves' room, and was awakened by Inspector Lawler. Tuttle then sat on the edge of the bed in his underwear, his clothes being on a chair next to the bed. Inspector Martin asked him if the clothes were his and, when he said they were, began to hand them to him. As the inspector picked up the shirt and trousers, a brown paper bag fell from the pocket of the trousers. Noticing that it was similar to the bag of marijuana found on the desk, he opened it and discovered what appeared to be bulk marijuana. He asked Tuttle about the bag, but Tuttle remained silent.

*Questions*: First. *Was the search of defendant Reeves' room illegal because it was made pursuant to a ruse perpetrated by the police?*

*No.* There is no exact formula for the determination of what constitutes reasonable or probable cause for an arrest. Each case must be decided on its own facts and circumstances and on the total atmosphere of the case.

Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. Probable cause has also been defined as having more evidence for than against, supported by evidence which inclines the mind to believe but leaves some room for doubt. It is not limited to evidence that would be admissible at the trial on the issue of guilt. The test is not whether the evidence upon which the officer acts in making the arrest is sufficient to convict but only whether the person should stand trial. (*People* v. *Ingle,* 53 Cal.2d 407, 412-413 [1-3] [2 Cal.Rptr. 14, 348 P.2d 577].)

It is established that information from a reliable informer can of itself be sufficient probable cause. (*People* v. *Prewitt,* 52 Cal.2d 330, 337 [11] [341 P.2d 1]; *Lorenzen* v. *Superior Court,* 150 Cal.App.2d 506, 509 [1] [310 P.2d 180].)

It is likewise settled that neither information from an anonymous informer nor information from an arrestee can of

itself be sufficient probable cause. (*Willson* v. *Superior Court*, 46 Cal.2d 291, 294 [4] [294 P.2d 36]; *People* v. *Amos*, 181 Cal.App.2d 506, 509 [4] [5 Cal.Rptr. 451].) Information from an anonymous source can be sufficient probable cause, however, if it is corroborated by other facts, sources, or circumstances that would justify reliance on it. (*Willson* v. *Superior Court, supra*, at p. 294 [4] et seq.; *People* v. *Boyce*, 183 Cal.App.2d 763, 766 [3] [6 Cal.Rptr. 859].) Although no single fact may justify an arrest, a combination or concurrence of facts may well do so. (*People* v. *Walker*, 165 Cal. App.2d 462, 465 [5] [331 P.2d 668].)

In the present case, the information given by the anonymous informer in the telephone call to Inspector Martin was clearly insufficient to justify an arrest. However, before an arrest was made, every fact contained in the call had been verified or corroborated. The officer had preexisting information concerning one of the named "losers," as Reeves had been involved in another narcotic investigation in which the officer had participated. At that time, the inspector had discovered that Reeves had been convicted in a federal court in Texas for smuggling heroin. Thus, when he received the call, he had sufficient preexisting information to determine that part of the anonymous information was reliable.

The partial reliability of the information demanded that the remainder be investigated further. The inspector conducted a record search of Ken McDonald and ascertained that a person so named indeed was a "loser," having served time for a narcotic offense.

Accompanied by Inspectors Lawler and Fogarty, Inspector Martin went to the McDonald automobile agency and found a marijuana cigarette in McDonald's possession. At this time, all the information received from the anonymous caller had been verified or corroborated with the exception of defendant Reeves' possession of marijuana.

McDonald then told the officers that he had received three marijuana cigarettes from Reeves at the King George Hotel the previous evening. This information did more than verify the information from the anonymous caller; it provided independent corroboration of the call by another source. (*Willson* v. *Superior Court, supra*, 46 Cal.2d at p. 295.)

Since the information received from the anonymous caller had been substantially verified—the address proved correct, both men were "losers," McDonald possessed narcotics—and defendant Reeves' possession was corroborated by similar information from another source (McDonald), Inspector

Martin acted with reasonable and probable cause when, relying on such information, he arrested Reeves.

Defendants contend that if the officers possessed probable cause to arrest prior to arrival at the hotel, then the subterfuge regarding the letter was unnecessary. However, the subterfuge was a precaution to prevent the destruction of evidence, which often occurs when officers announce their presence and demand entry. (See *People* v. *Montano,* 184 Cal. App.2d 199, 205 [6] [7 Cal.Rptr. 307].)

Second. *Was there ample probable cause to arrest defendant Tuttle?*

*Yes.* Tuttle contends that neither association with one known to have committed a felony nor presence on premises suspected to contain narcotics is sufficient probable cause to search or arrest.

This contention is correct. However, in the present case there was more than mere presence or association. As pointed out above, the officers had reasonable cause to believe that an occupant of the room (Reeves) was committing a felony and that the room contained narcotics. After they entered the room and before Tuttle was arrested, their suspicions had been verified—an occupant was committing a felony, and the room contained marijuana.

Although the combination of these two factors alone might not constitute sufficient probable cause to arrest and search a casual visitor in the room, defendant Tuttle was more than a casual visitor; he was asleep in the bed, dressed only in his underwear, and was thus apparently an occupant of the room. Accordingly, it was reasonable to believe that he had more than superficial contact with the marijuana therein. (*People* v. *Ramirez,* 185 Cal.App.2d 301, 306 [5b] [8 Cal. Rptr. 184].)

Therefore, the officers had reasonable cause to arrest and make a search incident thereto. It is noteworthy that no search was made, although one was intended. Rather, as one of the officers picked up defendant Tuttle's clothes in order to search them before handing them to him, a brown paper packet containing marijuana similar to others in the room fell from the pocket. Observing that which is in plain view is not a search. (*People* v. *Murphy,* 173 Cal.App.2d 367, 377 [23a] [343 P.2d 273]; *People* v. *Spicer,* 163 Cal.App.2d 678, 683 [4-6] [329 P.2d 917].)

Third. *Did the trial court properly sustain objections to questions asked witness McDonald?*

*Yes.* Defendants contend that the trial court ruled improperly on the privilege against self-incrimination exercised by the witness McDonald.

There are two privileges against self-incrimination: (1) a defendant's privilege and (2) a witness' privilege. A defendant need not take the stand at all, whereas a witness must take the stand and exercise the privilege as to each question that would have a tendency to subject him to criminal prosecution. (See Witkin, Cal. Evidence (1958) § 447, p. 498.)

In the present case, the defense called McDonald as a witness, and he took the stand accompanied by independent counsel. He answered preliminary questions concerning his name and address, but refused to answer two questions relating to the discovery of narcotics in his possession by police officers on the ground that his answers might tend to incriminate him. The court sustained objections to both questions, and defense counsel asked no further questions.

The court's ruling that the answers to questions concerning the discovery of narcotics in the possession of the witness would tend to incriminate him was based on the previous testimony of Inspector Martin that he had discovered narcotics in the witness' possession. From the record it is evident that the witness exercised, and the court ruled on, a witness' privilege and not a defendant's privilege.

It is clear that answering the questions would have tended to incriminate the witness. Defendants are correct that the questions when removed from the context of the case were innocuous in and of themselves. However, answers that "might furnish a link in the chain by which a conviction might hang" are privileged, as well as direct admissions of a crime. (*People* v. *Lawrence,* 168 Cal.App.2d 510, 516 [7] [336 P.2d 189].)

The court properly takes into consideration all the circumstances of the case in determining whether there is a real danger that a direct answer to a question may incriminate. (*People* v. *Lawrence, supra,* at p. 516 [6].)

Fourth. *Did the district attorney exceed the scope of the direct examination during his cross-examination of defendant Reeves?*

*No.* Defendant Reeves was called as a defense witness on behalf of defendant Tuttle. On direct examination by the attorney for Tuttle, Reeves testified that he met Tuttle in the early morning hours of the day they were arrested; Tuttle was "extremely drunk"; Reeves took him to his room at the

King George Hotel, helped him undress, folded his clothes, and placed them on a chair; he did not put the package of marijuana into Tuttle's pants pocket; the pockets of the pants were empty when he folded the clothes over the chair; and Tuttle fell asleep. Reeves said he did not see the packet of marijuana fall from Tuttle's pants pocket, but saw it lying on the floor. This last testimony was the only testimony relating to the time of the arrest given by Reeves on his direct examination.

On cross-examination by the attorney for defendant Reeves, Reeves testified that he had also been drinking that night and that defendant Tuttle was not the only visitor to the room during the night.

On cross-examination by the assistant district attorney, Reeves testified again to meeting Tuttle, escorting Tuttle to his room, helping him undress, and putting him to bed. The attorney for Reeves then objected to certain questions asked by the prosecution, on grounds that they were either outside the scope of the direct examination or incompetent.

Some of the questions concerned the location of the narcotics and cigarette papers when Tuttle entered the room in the early morning and whether such were visible at that time. Others concerned the location of the "roach" seen from the hallway by the officer and whether Reeves told the officers that all the narcotics found in the room were his. The remainder related to the packet of marijuana that fell from the pocket of Tuttle's pants.

In *People* v. *Zerillo*, 36 Cal.2d 222, 227 [4] [223 P.2d 223], we stated: "Section 1323 of the Penal Code provides: 'A defendant in a criminal action or proceeding cannot be compelled to be a witness against himself; but if he offers himself as a witness, he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief. . . .' This does not mean that the cross-examination must be confined to a mere categorical review of the matters, dates or times mentioned in the direct examination. [Citations.] It may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given by him on his direct examination. [Citations.] . . . If a defendant takes the stand and makes a general denial of the crime with which he is charged the permissible scope of cross-examination is very wide. [Citations.] Moreover, as stated in *People* v. *Teshara,* 141 Cal. 633, 638 [75 P. 338], 'A defendant cannot, by testifying to a state of things contrary to and

inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies. He can be cross-examined with respect to facts or denials which are necessarily implied from the testimony in chief, as well as with respect to facts which he expressly states.' [Citations.]'' (See *People* v. *Butterfield*, 177 Cal. App.2d 553, 559-561 [2 Cal.Rptr. 569].)

The witness testified extensively concerning his and Tuttle's return to the room and the help afforded by him in undressing Tuttle and putting him to bed. Clearly, therefore, the questions concerning the location and visibility of the narcotics at this time were within the scope of the direct examination. It should also be noted that three of the valid questions were disallowed, thereby barring argument that the defense was injured by the questions.

The extensive cross-examination regarding the packet of marijuana that fell from the pocket of Tuttle's pants was well justified and within the scope of the pregnant implications contained in the sole question and answer elicited on the subject on direct examination, namely: ''Q. Did you see that brown bag marked People's Exhibit No. 7 fall from his [Tuttle's] right trousers pocket on the floor? A. No, it was laying [*sic*] on the floor.''

It was also proper under the rule that when testimony has been introduced relative to an occurrence, all parts of that occurrence, verbal as well as physical, are properly within the scope of the cross-examiner's probe. (*People* v. *Whitehead*, 113 Cal.App.2d 43, 49-50 [5] [247 P.2d 717].)

The questions concerning the location of the ''roach'' seen by the officer from the hall and whether Reeves told the officers that all the narcotics found in the room were his, if not within the rules already discussed, were hardly prejudicial to defendants. (Cf. *People* v. *Watson*, 46 Cal.2d 818, 837 [13] [299 P.2d 243].) The latter question was disallowed by the court, and the former question was repetitious of the possession of narcotics otherwise established.

I would affirm the judgments.

Schauer, J., concurred.

Respondent's petition for a rehearing was denied May 20, 1964. Schauer, J., and McComb, J., were of the opinion that the petition should be granted.